**UNITED STATES, Appellee,**

v.

**Staff Sergeant Alfred W. HARDY, Jr., 228–80–0263, United States Army, Appellant.**

**ACMR 8901841.**

U.S. Army Court of Military Review.

30 March 1990.

For Appellant: Captain Thomas A. Sieg, JAGC, Captain Jeffrey J. Fleming, JAGC, Captain James E. O'Hare, JAGC USAR (on brief).

For Appellee: Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Maria C. Fernandez, JAGC, Captain James K. Reed, JAGC (on brief).

Before FOREMAN, SMITH, and VARO, Appellate Military Judges.

## OPINION OF THE COURT

SMITH, Judge:

On 18 May 1989, appellant was tried by a general court-martial composed of officer and enlisted members at Fort Lee, Virginia. Consistent with his pleas, appellant was found guilty of consensual sodomy, violating a lawful general regulation by socializing with a trainee by engaging in sodomy, dereliction of duty by absenting himself from his duties as Charge of Quarters, wrongful distribution of cocaine and wrongful use of cocaine in violation of Articles 125, 92, and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 925, 892, and 912a (1982 & Supp. I 1983), respectively. His sentence to a dishonorable discharge, confinement for one year, total forfeitures and reduction to Private E1 was approved by the convening authority.

### I

■ Appellant first asserts that the military judge erred by failing to dismiss Charge I and its Specification (consensual sodomy) as multiplicious for findings with Specification 1 of Charge II (violating a lawful regulation by socializing with a trainee by engaging in sodomy). We agree. In this case the two specifications were based on the same acts. *See United States v. Baker*, 23 M.J. 226 (C.M.A.1986) (summary disposition), citing *United States v. Jefferson*, 21 M.J. 203 (C.M.A.1986), and *United States v. Timberlake*, 18 M.J. 371 (C.M.A.1984). We will take corrective action in our decretal paragraph.

### II

■ Appellant secondly alleges that: THE MILITARY JUDGE ERRED TO APPELLANT'S PREJUDICE BY ABANDONING HIS IMPARTIALITY IN *SUA SPONTE* INITIATING A DISCUSSION OF THE APPROPRIATENESS OF DEFENSE COUNSEL'S SENTENCING ARGUMENT, AND SUBSEQUENTLY ALLOWING TRIAL COUNSEL TO INTRODUCE ADDITIONAL IMPROPER REBUTTAL.

The defense in extenuation and mitigation called a clinical psychologist who had participated in treating appellant after January 1989. He testified that he had seen appellant four times and had consulted with an alcohol and drug counselor and a psychiatrist who had also treated appellant. He stated that "there was a fairly complex diagnosis [for appellant] starting with adjustment disorder with depressed mood. Okay. Also, alcohol dependence, cocaine dependence, and mixed personality disorder." He further stated that it was very important to appellant to be a good father and that appellant seemed to be "genuinely trying to be a good father, be a good husband at—in the face of worrying about his—whether he could continue to—to be or to attempt to be a good father and good husband." On cross-examination the witness clearly stated that appellant's use of cocaine did not fit with being a good family man but "what I'm saying is that he attempts to be a good family man and that's important to his identity."

Two noncommissioned officers were called who had worked with appellant in prior assignments. Both testified as to appellant's "superb" and "outstanding" duty performance at times significantly prior to the charged offenses. Appellant's wife testified that the appellant took care of the children while she worked at night, that appellant spent more time with the children than she did and that "the kids are crazy about him."

The only discussion initiated by defense counsel concerning Specification 1 of Charge III (wrongful distribution of cocaine) appeared in appellant's unsworn statement as follows:

Q. You heard the Stipulation of Fact read by Captain Kealey earlier, did you not, Sergeant Hardy?

A. Yes, sir.

Q. Well, let's go back to that night that "distribution" took place. What happened that evening? Who came to who?

A. Sir, my neighbor came into my quarters.

Q. Where does this guy live?

A. Right—directly next door to me, sir.

Q. Okay. Is—is this that registered source they were talking about?

A. Yes, sir.

Q. Now what did he do? Where did he go?

A. At the time when he came in the door, sir, my oldest daughter Jenay (phonetic), opened the door. I was in the kitchen cooking their dinner.

Q. Could you tell the panel what, if anything, this gentlemen said to you when he came into you in the kitchen?

A. Well, sir, at first when he came into the kitchen, I had my—my kids to leave out of the kitchen. My kids have a habit of if I or my wife is in there cooking they like to be in there watching or observing. And once they got out of the kitchen my neighbor asked me if I would like to take a ride with him to get some drugs.

Q. Okay. Now, apparently, that evening you did, in fact, get in his car later on?

A. We left later on, sir, but not at the moment when he first came in.

Q. Okay, right. Why did you get in his car with him and go there?

A. He—he's my neighbor, sir, and I considered him a friend.

Q. All right. Sergeant Hardy, as I understand the Stipulation of Fact, is it true later on you got out of the car with the money he gave you. Is that correct?

A. Yes, sir, I did.

Q. And obtained some vials of a contraband drug?

A. Right, sir.

Q. All right. And what did you do with these vials?

A. Soon as I got back in the car, sir, I handed them to him.

Q. All right. Sergeant Hardy, did you make any money off of this transaction?

A. No, sir, I didn't.

Q. Are you a moneymaking drug dealer?

A. Sir, I don't sell drugs at all.

Subsequently, over defense objection, Special Agent (SA) Michael F. Redmond testified in rebuttal as to the underlying factual circumstances surrounding Specification 1 of Charge III. Special Agent Redmond testified that the individual working as a registered source had been wired for voice interception when he entered appellant's kitchen. Trial counsel argued on sentencing that according to the testimony of the psychologist, part of appellant's depression was caused by cocaine addiction. Trial counsel further argued that although the psychologist testified that appellant wanted to be a good family man the appellant's conduct was inconsistent with the concept of a "good family man" and that the testimony regarding appellant's duty performance was limited to periods well before the charged offense.

Defense counsel then commented on the evidence in his argument on sentencing:

The last sentence in this Stipulation of Fact really says something. "The chemical analysis indicated that the substance purchased by Staff Sergeant Hardy was cocaine." The substance purchased by Staff Sergeant Hardy was cocaine. Well, I submit to you that you all have the opportunity to get another message out there today as well. I tell you, as a defense counsel, I know that I have to see people involved in—in drug offenses or accused of drug trafficking and things like that and I keep wondering when in the world is the client gonna come into my office—the one who really sells drugs and makes money off of them and has been—wears the diamond rings and drives a fancy BMW or something with his illicit drug money. I haven't seen one yet and we certainly don't have one here today, ladies and gentlemen. What's really repugnant in this case is not my client's behavior as much as the behavior of the CID undercover agent who went right into my client's quarters when my client was cooking his children's dinner and walked right up to my client in front of his kids and asked him about getting him some drugs. As my client testified, the kids were there, he got them out of the kitchen, but he didn't go to this guy and ask him to buy some

drugs. This undercover agent went to my client in his house. My client told him to come back later, and yes, my client did help this man obtain his drugs. The man came back, drove my client in that man's car, and gave my client the cash, and asked my client to get the vials of cocaine. My client made absolutely no profit from this transaction and the only reason he's guilty here today is, as Captain Kealey explained to you, the elements of the offense are met simply by one man handing a drug to another one. Simple as that. Profit or not profit, BMW or no BMW, it's still considered distribution. If the other—undercover agent had left the car himself and bought the stuff with his money, my client would not have committed the offense other than, perhaps, showing the man where he could buy the stuff. That was it. My point, ladies and gentlemen, is that we have CID agents here spending a tremendous amount of time and money investigating drug trafficking on Fort Lee, but in this case they did not nab some career drug dealer. In fact, I submit to you, they did not nab a drug dealer period. They did not nab someone leading a life of luxury or making illicit money. They just nabbed a troubled man, who when asked by an undercover agent, helped an undercover agent buy some drugs after this agent went into his house and asked him while my client was cooking his children's dinner.

There was no government objection to the argument.

Immediately following defense counsel's argument, the military judge asked to see counsel in chambers. After the recess, the military judge stated on the record:

Now the reason that we're back here is, is that when I called the recess something in my mind on the defense coun-

sel's argument raised the possibility that we needed to bring additional evidence to the members attention. In an 802 conference—that there came to the court's attention that there was, in fact, a statement indicating prior sales of cocaine by the accused or distributions of cocaine by the accused. It's the court's feeling that the argument of counsel led to the fact or—or could have have led to the conclusion that the charged offense was the only time that the accused had been involved in cocaine and which was not the case and was not the feeling of the court when he was making the argument. Therefore, I'm going to take the extraordinary step of allowing counsel to reopen their case and to present the additional evidence of the statement and the statement only.[1]

When the court members returned, the military judge explained that based on the arguments he felt it "necessary and relevant" to allow additional evidence. Defense objections were noted. Trial counsel then recalled SA Redmond and through him introduced a confession made by appellant. Appendix B.

■■■ The military judge is the most dominant figure in a trial by court-martial. *United States v. Manuel*, 8 M.J. 822, 826 (A.F.C.M.R.1979). A judge must conduct himself and his court impartially, and must not assume the role of advocate or partisan. *United States v. Oakes*, 3 M.J. 1053 (A.F.C.M.R.1977), *petition denied*, 4 M.J. 242 (C.M.A.1978). The trial judge has the right to develop the evidence, however, the judge must be careful to maintain an impartial and objective stance. *United States v. Snipes*, 19 M.J. 913 (A.C.M.R. 1985). The test for determining whether a judge has abandoned his role and become a partisan advocate is a subjective one, which

---

1. The military judge further explained his action in an affidavit submitted to this court. He states, as he did in court, that the confession was needed to show prior drug involvement, and that he had suspected other drug involvement because "I had been the legal advisor for CID in Europe from 1983–1986. During that time I had dealt with numerous consensual wiretaps and had come to realize that CID did not use them on a first time basis with a suspect. What I thought was that CID must have other evidence indicating drug involvement by SSG Hardy that had not or was not coming out." The military judge also states in his affidavit that the confession was needed to rebut "good NCO and good family man" testimony. Appendix A.

must take into consideration the totality of the circumstances. *United States v. Reynolds*, 19 M.J. 529 (A.C.M.R.1984), *affirmed*, 24 M.J. 261 (C.M.A.1987). "The military judge should prevent unnecessary waste of time and promote the ascertainment of truth, but must avoid undue interference with the parties' presentation or the appearance of partiality." Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 801 discussion. *See also United States v. Bouie*, 18 M.J. 529 (A.F.C.M.R.1984) (A military judge must remain impartial and must not display support for one party over the other); *United States v. Holmes*, 1 M.J. 128 (C.M.A.1975) (Once a military judge sheds his impartiality and demonstrates support for the prosecution, an accused is adversely affected and denied a fair trial). When a military judge abandons his impartial role to become an advocate for the prosecution, he has committed reversible error. *United States v. Shackelford*, 2 M.J. 17 (C.M.A. 1976).

Appellant's theory on extenuation and mitigation was that he was dependent on cocaine and alcohol and psychologically troubled and that his involvement with cocaine was not one of profit in the sense that he should be viewed as a dealer. Nothing in the evidence or argument presented by the defense "led to the conclusion that the charged offense was the only time the accused had been involved in cocaine" or was misleading to the members.

At the time of the military judge's intervention, the government had already completed its case and rebuttal, and chose not to seek admission of appellant's confession.[2] Defense counsel had quite properly argued the facts in the light most favorable to his client. Defense counsel's comments on the evidence were well within the bounds of proper argument, and trial counsel did not object. We find that by acting, *sua sponte*, after the defense argument, the military judge improperly assumed the role of an advocate by ordering trial counsel to submit further "rebuttal."

The military judge in this case erred by failing to discharge his duty to remain and to appear impartial. Given the military judge's improper role, this court cannot adequately determine with any reasonable certainty what appellant's sentence would have been absent the error. *See United States v. Sales*, 22 M.J. 305 (C.M.A.1986).

Accordingly, the findings of guilty of Charge I and its Specification are set aside, and Charge I and its Specification are dismissed. The remaining findings of guilty are affirmed. The sentence is set aside. A rehearing on the sentence may be ordered by the same or a different convening authority.

Judge VARO concurs.

FOREMAN, Senior Judge, concurring:

As to the issue of multiplicity, I have difficulty with the concept that sodomy, punishable by confinement for five years, is a "lesser included offense" of one punishable by confinement for two years, but *United States v. Baker*, 23 M.J. 226 (C.M. A.1986), appears to so hold. I note that both cases cited in *Baker* involved violations of Article 133, 10 U.S.C. § 933, so that both the "greater" and "lesser" offenses carried the same maximum punishment. Manual for Courts–Martial, United States, 1984, Part IV, paragraph 59e. Absent clarification by the Court of Military Appeals, I must concur in the anomalous result in this case.

I concur without reservation in the remainder of Judge Smith's opinion.

### APPENDIX A

### AFFIDAVIT

I was asked to submit this affidavit in response to the request by Appellate Government counsel concerning the allegations raised in the case of United States

---

**2.** Trial counsel by affidavit asserts that she attempted to introduce the confession. A careful

review of the record reveals no overt attempt.

v. Hardy. The assignment of error by Appellate Defense Counsel, as I understand it, alleges that I departed from my impartial role by sua sponte allowing government counsel to reopen their case and present additional evidence that I thought the members ought to hear. Specifically, it involves a statement that Hardy had given to CID concerning drug involvement other than that for which he was charged in the instant case.

As I was listening to the extenuation and mitigation evidence, I began to think that SSG Hardy's involvement with drugs was a one time affair. The mitigation testimony by the defense indicated that he was a good NCO and a dedicated family man. However, government counsel, on rebuttal called SA Michael Redmond to the stand. He indicated, early in his testimony (R. 213), that they (CID) had received permission from Army General Counsel for a consensual wiretap between SSG Hardy and a registered source. At that point I began to wonder whether the involvement with drugs by SSG Hardy was really a one time affair. I had been the legal advisor for CID in Europe from 1983–1986. During that time I had dealt with numerous consensual wiretaps and had come to realize that CID did not use them on a first time basis with a suspect. What I thought was that CID must have other evidence indicating drug involvement by SSG Hardy that had not or was not coming out.

The sentencing argument of the defense counsel only heightened my suspicion that there was other evidence that CID might have on SSG Hardy. He indicated in his closing argument, in part, (R. 228–229), that the defendant was basically a good family man, that it was the conduct of the CID in this case that was reprehensible and not his client's, and that the CID had not nabbed a career drug dealer but a "troubled man." I felt that he might be unintentionally misleading the panel. At the close of the defense argument, I called both counsel into my chambers to discuss my suspicions (R. 230).

At the outset of that session I asked the trial counsel if she had any additional evidence indicating drug involvement by SSG Hardy. She produced the statement that involves the assignment of error. I asked her why she had not tried to introduce this statement. Much to my surprise she indicated that she had been attempting to do so. I am unsure at what point in the record that she indicated she had attempted the introduction but I believe it occurs at p. 215 of the record. Wherever it was, the defense counsel had objected and, for the reason of the moment, I had sustained the defense counsel's objection. I then asked the defense counsel if he had been aware of this statement before now. He indicated that he had been aware of it for some time. I then reviewed the statement and indicated to both counsel that I thought that the panel had been misled. I told them that I had gotten the opinion initially that I felt there had been only a one time involvement with drugs by the accused and that I thought the panel might believe the same. *Based on the information presented by the defense counsel during his mitigation evidence*, specifically that the defendant was a good NCO and a good family man, I felt that I might have been precipitous in not allowing government counsel to earlier proceed with the admission of the statement. I do not know why she did not earlier inform me that that was what she was attempting to do. Had I known the statement existed at the time the trial counsel had initially attempted to introduce it, I would have admitted it.

I told the trial counsel that, if she wished, I would allow her to reopen her case to present the statement. She indicated that she desired to do so. We concluded the session in chambers and, on the record, I, perhaps too briefly, indicated what we intended to do. I also accorded the defense counsel the right to present any additional testimony with regard to the statement. He declined to do so.

/s/ William B. Ramsey
WILLIAM B. RAMSEY
LTC, JA
Military Judge

APPENDIX A—Continued

Subscribed and sworn before me this 12th
day of January, 1990.

/s/ Mary B. Dennis
Comn exp. 7-27-90

## APPENDIX B

### SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is Office of The Deputy Chief of Staff for Personnel.

| LOCATION Fort Lee, VA 23801 | DATE 26 Jan 89 | TIME 15:47 | FILE NUMBER 0035-89- CID022-50611 |
|---|---|---|---|

| LAST NAME, FIRST NAME, MIDDLE NAME HARDY, Alfred William | SOCIAL SECURITY NUMBER. 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 | GRADE/STATUS E-6 |
|---|---|---|

ORGANIZATION OR ADDRESS
HHC, 23rd QM Bde, Ft Lee, VA 23801

I, Alfred William HARDY, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I have had a problem with drugs since I was about twenty three years old. Since this time I had used marihuana, speed, acid (LSD), hashish, and cocaine. When I went over to Germany in 1982, I stopped messing with drugs and cleaned up my life. It was not until last year when things got screwed up. On 22 Jan 88, my wife left me and my life just kind of crumbled. I started doing a little/crack/cocaine lot of alcohol about the time that I received a Field Grade Article 15 for Attempted Fraternization in March 88. In Jul 88, things were not looking up although my wife had came back to me in Jun 88. In Jul 88, things just got bad and I just couldn't deal with what was going on around me with my professional life and personal life. I started doing "crack" (cocaine) and I would drive down to Petersburg and pick up some there and then take it back to my quarters where I would use it in my bathroom. This continued for sometime to the point where I am now. I enjoy it, but I don't need it. The majority of the times since Jul 88 when I got on crack to now, when I go out and get some it is because I am having serious emotional problems. I am not a dealer of crack and have never sold any to anyone. I have went and picked up some on occasion for people and have also taken some people down to where they could get it. In Oct-Nov 88, I took a guy named HOLLEY and another guy named KELLEM, (I think they are assigned to the 54th QM Co, FLVA) out to get some crack. I would take them down into Petersburg on occasion and I introduced them to the drealers and they bought their own. I never received anything from them for this, but I have smoked some of it with them from time to time. Another guy named COLLINS, who used to be assigned to BPLD used to sell crack and I used to by from him sometime. He has since got out of the Army and living in Petersburg somewhere. He used to live in Lee Hall Apartments, but I haven't seen him for awhile. There is another guy named LOVE who I've taken downtown to purchase crack with on several occasions, four or five times, over the past several months. I don't consider this dealing or anything like that, but I was just doing a friend a favor. I've never smoked with LOVE, and I don't know if he is selling it or using it. The last time I had anything to do with him was last night. I showed him how to get to West Petersburg and once there I made contact with some dealers and purchased five vials which I gave to him. We were in his car and he asked me to show him how to get down there.
Q: There is a female who resides in some apartments located behind Hardees in Petersburg, VA. Tell me about your relationship with her concerning crack?
A: I just picked her up and got to know her. About two weeks ago her and I went to a hotel located off post and smoked about three or four vials together.
Q: Were KELLEM and HOLLEY together everytime you took them downtown?
A: Yes,
Q: How many times did you take them down so they could purchase some cocaine?
A: About three or four times.
Q: How many vials would they buy when they went down there?
A: KELLEM would always buy it. One time I know he bought five hundred dollars worth.

| EXHIBIT | INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF___ TAKEN AT___ DATED___ CONTINUED." THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT AND BE INITIALED AS "PAGE___OF___ PAGES." WHEN ADDITIONAL PAGES ARE UTILIZED, THE BACK OF PAGE 1 WILL BE LINED OUT, AND THE STATEMENT WILL BE CONCLUDED ON THE REVERSE SIDE OF ANOTHER COPY OF THIS FORM.

DA FORM 2823 JUL 72 SUPERSEDES DA FORM 2823, 1 JAN 68, WHICH WILL BE USED.

FOR OFFICIAL USE ONLY          PROSECUTION EXHIBIT 4 FOR ID

## APPENDIX B—Continued

*CO33-89-C/D022-5V611* I

Statement of SSG Alfred William HARDY, 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, HHC, 23rd QM Bde, Ft Lee, VA dated 26 Jan 89, Continued:

Q: When was this?
A: I think this was in November.
Q: Did he give you any of it for taking him down there?
A: No.
Q: Was COLLINS selling while in the Military?
A: I don't know. I never bought anything from him until after he was discharged.
Q: Did he get out over drugs?
A: No. He was QMP'd, but I don't know why. He was also under weapons charges.
Q: How many times have you taken LOVE out to buy cocaine?
A: I don't know, maybe six times.
Q: Does he deal?
A: No.
Q: Last night when you got to West Petersburg (Dinwiddie) did he give you the money to give to the dealers or did you use your own?
A: He gave me the money.
Q: Did he give you any crack?
A: No.
Q: Have you ever made any money or gotten free dope from taking people down and assisting them in purchasing cocaine?
A: No.
Q: How many times a week do you smoke crack?
A: Maybe once every other week or so.
Q: When you go downtown to purchase crack, where in Petersburg are you going?
A: Anywhere, its all over down there. Anywehre you want you can by it off a street corner.
Q: Do you have special dealers that you deal with or just street dealers?
A: Just the guys hanging on the street.
Q: Have you ever been arrested for drugs in the past.?
A: No.
Q: Ever suspected of drug violations in the past?
A: No.
Q: Have you did any other drugs since arrival on Ft Lee other than crack?
A: No.
Q: Do you have anything to add to this statement?
A: All I want to do is just get out of the Army. My career is ruined and I've lost everything. There is nothing left.
Q: Anything else?
A: No.///END STATEMENT///

Initials of Person Making Statement _____

EXHIBIT I

## APPENDIX B—Continued

(0053-89-C10022-5061/

STATEMENT (Continued)

---

**AFFIDAVIT**

I, Alfred William HARDY _____ HAVE READ OR HAVE HAD READ TO ME THIS STATE-
MENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE __2__ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT
MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT
OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

(Signature of Person Making Statement)

WITNESSES:

Subscribed and sworn to before me, a person authorized by law
to administer oaths, this 26th day of __January__ , 19 89
at Fort Lee, VA 23801

ORGANIZATION OR ADDRESS

(Signature of Person Administering Oath)

SA MICHAEL F. REDMOND
(Typed Name of Person Administering Oath)

ORGANIZATION OR ADDRESS

Article 136 (b) (4) UCMJ
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT

PAGE 3 OF 3 PAGES